[No. A098122. First Dist., Div. Four. Jan. 31, 2003.]

MODESTA AQUINO et al., Plaintiffs and Appellants, v.
ASIANA AIRLINES, INC., et al., Defendants and Respondents.

**[Opinion certified for partial publication.\*]**

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II.D. and II.E.

COUNSEL

Law Offices of Esperanza V. Bada and Esperanza V. Bada for Plaintiffs and Appellants.

Lynch, Gilardi & Grummer, James Parton III, William A. Bogdan; Law Offices of James I. Bang and James I. Bang for Defendants and Respondents.

OPINION

**RIVERA, J.**—Plaintiffs sued Asiana Airlines, Inc., and one of its managers after plaintiffs were not allowed to board their ticketed flight, claiming this refusal was due to their age and perceived physical limitations. The trial court granted defendants' motion for summary judgment, concluding that the Warsaw Convention or the Airline Deregulation Act of 1978[1] preempted plaintiffs' action. We hold that plaintiffs' claims are not preempted, and that triable issues of material fact exist as to most, but not all, of plaintiffs' causes of action.

## I. FACTS AND PROCEDURAL HISTORY

Modesta Aquino and her husband, David Aquino, who is now deceased, (the Aquinos) had round-trip tickets on a November 29, 1999, Asiana Airlines, Inc., (Asiana) flight from San Francisco International Airport to the Philippines. The tickets provided that Asiana's services were subject to "conditions of carriage and related regulations which are made part hereof (and are available on application at the offices of carrier) . . . ." Asiana's "General Conditions of Carriage for International Passenger and Baggage" included the following provision: "[Asiana] may refuse to carry, cancel the reserved space of, or remove enroute any passenger when, in the exercise of its reasonable discretion, [¶] (1) Such action is necessary for reason of safety; [¶] . . . [¶] (3) The conduct, age or mental or physical condition of the passenger is such as to: [¶] a. require special assistance of [Asiana] or [¶] b. cause discomfort or make himself objectionable to other passenger, or [¶] c. involve any hazard or risk to himself or to other persons or to property . . . ."

---

[1]The full name of the Warsaw Convention is the Convention for the Unification of Certain Rules Relating to International Transportation by Air (Warsaw Convention). (Oct. 12, 1929, 49 Stat. 3000, 3014, T.S. No. 876 (eff. Oct. 29, 1934), reprinted in hist. & revision notes, 49 U.S.C. (2000) foll. § 40105, p. 1140 et seq.) The preemption provision of the Airline Deregulation Act of 1978 (the Act) is found at title 49 United States Code section 41713.

On the evening of the flight, the Aquinos, together with several relatives, went to the airport.[2] The Aquinos' daughter, Purificacion Landero (Landero), and son, Percival Aquino (Percival), went to Asiana's counter with the Aquinos' tickets and gave them to a ticket agent, while the Aquinos waited. Percival asked the agent to provide a wheelchair for David Aquino. The agent asked who the passengers were, and Landero pointed her parents out to the agent. The agent then called an Asiana manager, Tae Keun Han (Han), who is a defendant in this action. Han approached the Aquinos, then asked Landero how old the Aquinos were. She told him they were 90 years old.[3] According to Landero, Han told her the Aquinos were too old to travel. Han then told Landero the Aquinos would need a certificate from a doctor, certifying that they would be able to survive the flight, and suggested they visit the airport medical clinic to obtain a certificate.[4] The Aquinos visited the medical clinic; but although the clinic staff stated the Aquinos looked healthy and did not require treatment, they did not provide a certificate. The Aquinos walked back to the Asiana ticket counter. On the way back, David Aquino complained that his legs hurt from the walking.

When the Aquinos reached the Asiana ticket counter, Landero told Han the clinic staff had refused to provide a medical certificate but that the staff had said the Aquinos looked healthy. She also told him it was difficult for her father to walk long distances; according to Landero, Han replied, "If he cannot walk, why does he have to travel? Then he should not be traveling." Landero persisted in asking Han to allow her parents to board the airplane, and Han told her he would call the police. He went to his office, and shortly afterward, police officers arrived.

The Aquinos left the airport. The family was later informed that the Aquinos could travel on another Asiana flight, but that they would need a medical certificate. The Aquinos decided not to fly on Asiana; and on December 3, 1999, they traveled to the Philippines on a flight offered by another airline. Asiana refunded the cost of their original tickets. David Aquino died in the Philippines on February 5, 2000.

On November 22, 2000, Modesta Aquino filed suit against Asiana and Han both on her own behalf and as successor in interest to David Aquino, alleging causes of action for discrimination, intentional infliction of emotional distress, negligence, negligent infliction of emotional distress, and

---

[2] The flight was due to depart shortly after midnight, November 29, 1999. The family went to the airport approximately five hours before that time, around 7:00 p.m.

[3] In fact, according to Landero's testimony, David Aquino was 87 and Modesta Aquino was 94 at the time.

[4] Han indicated in his deposition that he did not object to Modesta Aquino boarding the flight, and that his only concern was for David Aquino's health.

breach of contract. Defendants brought a motion for summary judgment on August 24, 2001, claiming that the causes of action in the complaint were variously barred by the Warsaw Convention and the Act, and that there were no triable issues of material facts.[5] The trial court granted the motion, ruling that there was no triable issue of material fact regarding the applicability of the Warsaw Convention or the Act, that there was no triable issue of fact regarding breach of contract or discriminatory animus, and that defendants had proffered a valid business justification for their actions. The trial court treated the challenge to the cause of action for negligent infliction of emotional distress as a motion for judgment on the pleadings, and granted the motion. Judgment was entered in favor of Asiana and Han on December 26, 2001. This appeal ensued.

## II. Discussion

### A. *Standard of Review*

Our standard of review is well settled. In reviewing a summary judgment in favor of the defendant, we "independently assess the correctness of the trial court's ruling by applying the same legal standard as the trial court in determining whether any triable issues of material fact exist, and whether the defendant is entitled to judgment as a matter of law." (*Rubin v. United Air Lines, Inc.* (2002) 96 Cal.App.4th 364, 372 [117 Cal.Rptr.2d 109].) In doing so, "we construe the moving party's affidavits strictly, construe the opponent's affidavits liberally, and resolve doubts about the propriety of granting the motion in favor of the opposing party." (*Ibid.*)

### B. *The Warsaw Convention Is Not Applicable*

The Warsaw Convention is "a comprehensive international treaty, signed in 1929, governing liability in 'all international transportation of persons, baggage, or goods.' In signing the Warsaw Convention, '[t]he contracting states in 1929 believed that limitations on liability would promote the development of the fledgling commercial air industry by allowing the airlines to predict their exposure to monetary damages and thereby obtain needed capital and adequate insurance coverage.'" (*Carey v. United Airlines* (9th Cir. 2001) 255 F.3d 1044, 1047.)

Only a few of the provisions of the Warsaw Convention are pertinent here. Article 17 provides: "The carrier shall be liable for damage sustained in the

---

[5]Defendants argued that the Warsaw Convention preempted the causes of action for discrimination, intentional infliction of emotional distress, negligence, and negligent infliction of emotional distress, and that all causes of action were preempted by the Act.

event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking." Article 22 limits the amount of monetary damage that can be awarded for such accidents. (Order of Civil Aeronautics Board Approving Increases in Liability Limitations of the Warsaw Convention and the Hague Protocol, reprinted in hist. & revision notes 49 U.S.C. (2000) foll. § 40105, pp. 1144-1145; 31 Fed.Reg. 7301 (May 13, 1966).) Article 24, as amended,[6] provides in pertinent part: "1. In the carriage of passengers and baggage, any action for damages, however founded, can only be brought subject to the conditions and limits set out in this Convention, without prejudice to the question as to who are the persons who have the right to bring suit and what are their respective rights." (Montreal Protocol No. 4.) Article 25, as amended, provides: "In the carriage of passengers and baggage, the limits of liability specified in Article 22 shall not apply if it is proved that the damage resulted from an act or omission of the carrier, his servants or agents, done with intent to cause damage or recklessly and with knowledge that damage would probably result; provided that, in the case of such act or omission of a servant or agent, it is also proved that he was acting within the scope of his employment." (*Ibid.*; see *Brandt v. American Airlines* (N.D.Cal. Mar. 16, 2000, No. C 98-2089 SI) 2000 U.S.Dist. Lexis 3164, *20; see also *Tseng, supra,* 525 U.S. at p. 167, fn. 10 [119 S.Ct. at p. 670].)

Where it is applicable, the Warsaw Convention provides the exclusive remedy for personal injuries. In *Tseng,* the United States Supreme Court considered whether a passenger may maintain an action for personal injury under local law where the claim does not satisfy the conditions for liability under the Warsaw Convention. There, a passenger was subjected to an intrusive security search during preboarding procedures at an international airport in the United States. She brought an action alleging causes of action for assault and false imprisonment, but no "bodily injury," as that term is used in article 17 of the Warsaw Convention. The court held that the Warsaw Convention preempts actions under local law: "[R]ecovery for a personal injury suffered 'on board [an] aircraft or in the course of any of the operations of embarking or disembarking,' Art. 17, 49 Stat. 3018, if not allowed under the Convention, is not available at all." (*Tseng, supra,* 525

---

[6]This amendment, Montreal Protocol No. 4 (Sen.Exec.Rep. No. 105-20, 2d Sess., pp. 21-32 (1998)) (Montreal Protocol No. 4), was ratified by the Senate on September 28, 1998. (See 144 Cong. Rec. S11059 (daily ed. Sept. 28, 1998); *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng* (1999) 525 U.S. 155, 174, fn. 14 [119 S.Ct. 662, 674, 142 L.Ed.2d 576] (*Tseng*).)

U.S. at p. 161 [119 S.Ct. at p. 660].)[7] The court also noted that a passenger who had not sustained "bodily injury" could not gain compensation under article 17 for her solely psychic or psychosomatic injuries. (*Tseng*, at p. 172 [119 S.Ct. at p. 673]; see also *Eastern Airlines, Inc. v. Floyd* (1991) 499 U.S. 530, 552 [111 S.Ct. 1489, 1502, 113 L.Ed.2d 569].) The court therefore concluded that the plaintiff was barred from pursuing an action not only under the Warsaw Convention but also under local law. (*Tseng, supra*, 525 U.S. at pp. 172, 176 [119 S.Ct. at pp. 668, 675].)

Following the decision in *Tseng*, several courts have held that the Warsaw Convention preempts other claims as well, including breach of contract, discrimination, and willful misconduct. (See *Carey v. United Airlines, supra*, 255 F.3d at pp. 1049-1051 [Warsaw Convention provides exclusive remedy for claims arising out of intentional misconduct]; *Brandt v. American Airlines, supra*, 2000 U.S.Dist. Lexis 3164 at pp. *13-20 [Warsaw Convention preempts claims for breach of contract and federal discrimination, and provides exclusive remedy for willful misconduct]; *Peralta v. Continental Airlines, Inc.* (N.D.Cal. Mar. 30, 1999, No. C 98-1252 MJJ) 1999 U.S.Dist. Lexis 4376, *5-6 [Warsaw Convention preempts contract claims based on delay]; *Turturro v. Continental Airlines* (S.D.N.Y. 2001) 128 F.Supp.2d 170, 180 [Warsaw Convention preempts federal discrimination claims as well as state tort claims]; *Waters v. Port Authority of New York & New Jersey* (D.N.J. 2001) 158 F.Supp.2d 415, 428-430 [Warsaw Convention preempts federal discrimination claims].) However, in order for the Warsaw Convention to govern a claim, the incident giving rise to the claim must take place "on board the aircraft or in the course of any of the operations of embarking or disembarking." (Warsaw Convention, art. 17.)

The question of whether a passenger is involved in any of the operations of embarking is a question of law to be decided based on the facts of each case. (*Schmidkunz v. Scandinavian Airlines System* (9th Cir. 1980) 628 F.2d 1205, 1207.) Numerous cases have construed the meaning of this phrase, generally applying a test that examines the totality of the circumstances. (See *Maugnie v. Compagnie Nationale Air France* (9th Cir. 1977) 549 F.2d 1256, 1262; *Marotte v. American Airlines, Inc.* (11th Cir. 2002) 296 F.3d 1255, 1260.) In making this determination, courts focus on several factors, in particular " '(1) the activity of the passengers at the time of the accident; (2) the restrictions, if any, on their movements; (3) the imminence of actual boarding; [and] (4) the physical proximity of the passengers to the gate.' " (*King v. American Airlines, Inc.* (2d Cir. 2002) 284 F.3d 352, 359, quoting *Buonocore v. Trans World Airlines, Inc.* (2d Cir. 1990) 900 F.2d 8, 10.)

---

[7]The parties did not dispute that the episode in question occurred in the course of embarking. (*Tseng, supra*, 525 U.S. at p. 167 [119 S.Ct. at p. 671].)

Applying this test, courts have found the Warsaw Convention applies to injuries suffered in a terrorist attack that took place inside a terminal, after the passengers had surrendered their tickets and passed through passport control, when they were standing in line at the departure gate, in an area reserved for passengers, waiting to be searched. (*Day v. Trans World Airlines, Inc.* (2d Cir. 1975) 528 F.2d 31, 32-34; see also *Evangelinos v. Trans World Airlines, Inc.* (3d Cir. 1977) 550 F.2d 152, 156.) The Warsaw Convention has also been held to apply to an airline's refusal to board passengers who had received their boarding passes, passed through security, and were in an area of the airport available only to ticketed passengers near the departure gate. (*Marotte v. American Airlines, Inc., supra,* 296 F.3d at pp. 1260-1261.) Similarly, a court held the Warsaw Convention applied to a claim for an airline's refusal to board passengers who had checked in, received their boarding passes, and boarded the vehicle that was to transport them from the terminal to the aircraft. (*King v. American Airlines, Inc., supra,* 284 F.3d at pp. 359-360.)

Courts have found the Warsaw Convention inapplicable, however, where passengers were still in common areas, were not under the control of airline personnel, or were not physically near the departure gate. (See *Buonocore v. Trans World Airlines, Inc., supra,* 900 F.2d at pp. 10-11 [passenger had checked in and was in public area of airport, not near ticket gate, free to move about terminal before his flight was called]; *McCarthy v. Northwest Airlines, Inc.* (1st Cir. 1995) 56 F.3d 313, 314, 316-317 [passenger had checked in and received boarding pass, was in a common area far from departure gate, was being led by airline agent toward customs area, but had not yet fulfilled most of the conditions necessary for boarding]; *Sweis v. Trans World Airlines, Inc.* (N.D.Ill. 1988) 681 F.Supp. 501, 505 [at time of terrorist attack passengers were checking in baggage and receiving boarding passes but were several steps from actual boarding, were not segregated from other passengers, were not near boarding gates, and flight was not scheduled for two more hours]; *Beaudet v. British Airways, PLC* (N.D.Ill. 1994) 853 F.Supp. 1062, 1067-1069 [passenger waiting in lounge after check-in not engaged in operations of embarking as matter of law]; *Schmidkunz v. Scandinavian Airlines System, supra,* 628 F.2d at p. 1207 [passenger had not yet received boarding pass and was in common passenger area].)

 Based on the record presented, we conclude the Aquinos were not engaged in the operations of embarking. At the time of the events giving rise to this action, they were in a common passenger area, attempting to check in. They had not checked their luggage or received their boarding passes. They had not progressed through security to an area restricted to passengers. Indeed, their complaint is that they were not allowed to *begin* the operations

of embarkation. The record does not show that they ever became engaged in those operations. Asiana does not direct us to any case extending the reach of the Warsaw Convention to the stage of attempting to check in, and our independent research does not disclose any.

Asiana contends that appellants were "participating in . . . pre-boarding procedures" and therefore all events were governed by the Warsaw Convention. In support, Asiana relies on *Lathigra v. British Airways PLC* (9th Cir. 1994) 41 F.3d 535, 539, in which the Ninth Circuit Court of Appeals stated: "Once the passenger presents herself to the carrier or its agents as ready to begin the air journey, the Convention generally governs liability for delays in the carrier's performance, and its provisions apply until completion of disembarkation at the destination airport." However, despite the dictum suggesting otherwise, *Lathigra* did not hold that the Warsaw Convention applied to activities that occurred at check-in. Rather, it held that travel delays caused by the negligent actions of airline employees in reconfirming flight reservations days before the passenger had even presented herself at the airport, where the carrier no longer served the route in question, were not covered by the Warsaw Convention. (*Ibid.*) The court also made clear that its previous decisions in *Schmidkunz* and *Maugnie*, both of which declined to apply the Warsaw Convention's liability limitations to injuries occurring in the common passenger areas of airport terminals, were still good law. (*Lathigra*, at p. 539, fn. 6.) We do not read *Lathigra* as holding that the Warsaw Convention preempts causes of action arising even before passenger check-in is completed.

We thus conclude the Warsaw Convention does not preempt the Aquinos' claims.

C. *The Airline Deregulation Act of 1978 Is Not Applicable*

Asiana argues that, even if the Warsaw Convention does not preempt this action, the Act does. The Act provides in pertinent part: "[A] State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart." (49 U.S.C. § 41713(b)(1).)[8]

■ The scope of this preemption, particularly as it relates to airline "service," has been the subject of considerable dispute, although it is clear

---

[8] A version of this provision was originally found at title 49 United States Code Appendix section 1305(a)(1). In 1994, it was amended and incorporated into the Federal Aviation Administration Authorization Act of 1994 as title 49 United States Code section 41713(b)(1). (*Charas v. Trans World Airlines, Inc.* (9th Cir. 1998) 160 F.3d 1259, 1262, fn. 2 (*Charas*).)

that the Act does not preempt all state law based actions related to an airline's conduct. For instance, in *American Airlines, Inc. v. Wolens* (1995) 513 U.S. 219, 228-229, 232-233 [115 S.Ct. 817, 824, 825-826, 130 L.Ed.2d 715] (*Wolens*), the United States Supreme Court held that the Act permits state law based court adjudication of routine breach of contract claims, reasoning that such actions do not allege a violation of state imposed obligations, but instead seek recovery solely for the airlines' alleged breach of its own, self-imposed undertakings.

The federal circuit courts have not devised a uniform test for determining whether a state law action is related to an airline's "service." The Ninth Circuit Court of Appeals has adopted an approach defining service for purposes of the Act's preemption clause as "the prices, schedules, origins and destinations of the point-to-point transportation of passengers, cargo or mail. . . . '[S]ervice' was not intended to include an airline's provision of in-flight beverages, personal assistance to passengers, the handling of luggage, and similar amenities." (*Charas, supra,* 160 F.3d at p. 1261.) Using this approach, the Ninth Circuit has concluded that the Act does not preempt personal injury claims based on the provision of amenities. (*Id.* at p. 1266.) The Ninth Circuit later extended this conclusion to hold the Act does not preempt discrimination claims based on the refusal to allow a disabled passenger to board an aircraft without a health certificate. (*Newman v. American Airlines, Inc.* (9th Cir. 1999) 176 F.3d 1128, 1130-1131 (*Newman*).)

In contrast, the Fifth Circuit Court of Appeals in *Hodges v. Delta Airlines, Inc.* (5th Cir. 1995) 44 F.3d 334, 336 adopted the following definition: " ' "Services" generally represent a bargained-for or anticipated provision of labor from one party to another. If the element of bargain or agreement is incorporated in our understanding of services, it leads to a concern with the contractual arrangement between the airline and the user of the service. Elements of the air carrier service bargain include items such as ticketing, boarding procedures, provision of food and drink, and baggage handling, in addition to the transportation itself. These matters are all appurtenant and necessarily included with the contract of carriage between the passenger or shipper and the airline. It is these [contractual] features of air transportation that we believe Congress intended to de-regulate as "services" and broadly to protect from state regulation.' " In reaching this conclusion, the Fifth Circuit was guided in part by an opinion of the Civil Aeronautics Board, which was formerly responsible for enforcing the Act,[9] that a state may not interfere with the services that carriers offer in exchange for their rates and

---

[9]See *Romano v. American Trans Air* (1996) 48 Cal.App.4th 1637, 1642 [56 Cal.Rptr.2d 428] (*Romano*).

fares, including liquidated damages for bumping (denial of boarding). (*Hodges v. Delta Airlines, Inc., supra,* 44 F.3d at p. 337 & fn. 5.) The court also quoted the United States Supreme Court's opinion in *Wolens, supra,* 513 U.S. at page 226 [115 S.Ct. at pages 822-823], which includes in its understanding of services " 'access to flights and class-of-service upgrades . . . .' " (*Hodges v. Delta Airlines, Inc., supra,* 44 F.3d at p. 336)[10]

The Ninth Circuit Court of Appeals originally adopted the Fifth Circuit Court of Appeals's approach (*Gee v. Southwest Airlines* (9th Cir. 1997) 110 F.3d 1400, 1406-1407; see also *Harris v. American Airlines, Inc.* (9th Cir. 1995) 55 F.3d 1472, 1476-1477), but in *Charas* concluded that this approach, as articulated in *Gee,* was "imprecise, difficult to apply, and inadequately reflective of the [Act's] goal of economic deregulation" (*Charas, supra,* 160 F.3d at p. 1263). In determining that "service" was intended to be limited to prices, schedules, origins, and destinations of flights, the Ninth Circuit looked to Congress's purpose in enacting the Act, viz., to achieve the "economic deregulation of the airline industry." (*Id.* at p. 1265.) The court reasoned: "Nothing in the Act itself, or its legislative history, indicates that Congress had a 'clear and manifest purpose' to displace state tort law in actions that do not affect deregulation in more than a 'peripheral manner.' *See Morales*[ *v. Trans World Airlines, Inc.* (1992) 504 U.S. at 390, 112 S.Ct. 2031. Further, that Congress did not intend [49 U.S.C. Appen.] § 1305(a)(1) to preempt all state tort claims is evident from at least two other provisions of the airline regulatory statutes. First, airlines are still required to maintain insurance that covers 'amounts for which . . . air carriers may become liable for bodily injuries to or the death of any person . . . .' 49 U.S.C. App. § 1371(q) (recodified as 49 U.S.C. § 41112(a)). Complete preemption of state law in this arena would have rendered pointless this requirement for insurance coverage. Second, the savings clause, [49 U.S.C. Appen.] § 1506, which provides that '[n]othing . . . in this chapter shall in any way abridge or alter the remedies now existing at common law . . . ,' read together with the preemption clause, evidences congressional intent to prohibit states from *regulating* the airlines while preserving state tort remedies that already existed at common law, providing that such remedies do not significantly impact federal deregulation. [Citations.]" (*Ibid.,* italics added.)

The Second District Court of Appeal has also held that the Act generally does not preempt state law personal injury claims. In *Romano* the court

---

[10]The split in the circuits on the interpretation of the term "service" is discussed in *DeTerra v. America West Airlines, Inc.* (D.Mass. 2002) 226 F.Supp.2d 274, 276-277 [concluding the Act preempts state law tort claims based on discrimination against a passenger based on handicap in boarding a flight].)

considered whether the Act preempted a common law personal injury claim arising out of an airline's failure to prevent one passenger from injuring another. The court concluded that the Act completely preempted all fare-related matters, but not state claims for personal injuries. (*Romano, supra*, 48 Cal.App.4th at pp. 1642-1643.) In reaching this conclusion the court, consistent with *Charas*, pointed to the United States Department of Transportation's adoption of a regulation requiring airlines to maintain liability insurance for bodily injury or death relating to the operation or maintenance of an aircraft. (*Romano*, at pp. 1642-1643, citing 49 U.S.C. § 41112(a), 14 C.F.R. § 205.5(a) (1992); & *Mudd v. McColgan* (1947) 30 Cal.2d 463, 470 [183 P.2d 10].) The court continued: "Since there is no provision in the [Act] for personal injury or property damages lawsuits, it follows ineluctably that liability insurance would be unnecessary if an injured passenger could not sue an airline for damages—and that, therefore, Congress intended that airlines respond to common law claims for personal injury damages." (*Romano, supra*, 48 Cal.App.4th at p. 1643, fn. omitted, citing *Hodges v. Delta Airlines, Inc., supra*, 44 F.3d at p. 338 & *Wolens, supra*, 513 U.S. at p. 231, fn. 7 [115 S.Ct. at p. 825].)

The court also rejected the airline's contention that the only nonpreempted personal injury claims are those related to operations and maintenance, and that all personal injury claims related to rates, routes, and fares are preempted. "Almost everything an airline does (or fails to do) is arguably related to service (selling tickets, loading luggage, providing smooth landings), some things more directly than others. To adopt the airline's view is to conclude that there is no remedy for in-flight negligence of any kind—unless the airplane itself malfunctions—because, as a practical matter, passengers are necessarily dependent upon the flight crew's 'service' for every- and anything that occurs in mid-air. Had that been the intent of Congress, we are confident it would have said so." (*Romano, supra*, 48 Cal.App.4th at p. 1643, fn. 6.)

Refocusing, then, on the legislative intent in enacting the Act, the court concluded: "[W]here the airlines have a legitimate interest to protect (the right to advertise their rates, set their routes, determine whether to provide food service on a particular flight), the states cannot interfere. But where there is no legitimate interest needing protection—as is the case when the issue is negligence—there is no preemption." (*Romano, supra*, 48 Cal.App.4th at p. 1645.)[11]

We agree with both the Ninth Circuit Court of Appeals and the Second District Court of Appeal that the Act does not preempt state law

---

[11]*Romano, supra*, 48 Cal.App.4th at pages 1644-1645, expressly disagreed with the Ninth Circuit Court of Appeals's opinion in *Harris v. American Airlines, Inc., supra*, 55 F.3d at pages 1476-1477, which held the Act preempted a passenger's claim against an airline for

personal injury and discrimination causes of action that have only a peripheral effect on deregulation. (See *Charas, supra,* 160 F.3d at p. 1265.) The facts alleged in this case are similar to those in *Newman.* There, the plaintiff was not allowed to board an airplane based on her disability and lack of a health certificate. (*Newman, supra,* 176 F.3d at pp. 1130-1131.) She brought state law tort and discrimination causes of action, which the airline asserted were preempted by the Act. (*Id.* at pp. 1129-1130.) The court there noted that, in a previous decision, it had concluded that "Congress did not . . . intend to preempt personal injury tort claims" (*id.* at p. 1131, citing *Charas, supra,* 160 F.3d at p. 1266), and ruled that the same analysis is applicable to claims for discrimination: "As used in a public utility sense, the term 'service' does not refer to alleged discrimination to passengers due to their disabilities" (*Newman, supra,* 176 F.3d at p. 1131). We agree with the Ninth Circuit's construction of the term "service," i.e., that it does not extend to discrimination due to age or disability, or to personal injury causes of action based on refusal to transport a passenger.[12]

The Aquinos have also alleged a cause of action for breach of contract. The United States Supreme Court has concluded that the Act does not preempt routine breach of contract claims. (*Wolens, supra,* 513 U.S. at pp. 232-233 [115 S.Ct. at pp. 825-826].) However, in reaching this conclusion, the court stated that courts are confined "to the parties' bargain, with no enlargement or enhancement based on state laws or policies external to the agreement." (*Id.* at p. 233.) Asiana contends that the breach of contract claim is preempted because it cannot be adjudicated without referring to a federal statute providing that, subject to certain regulations, a "foreign air carrier may refuse to transport a passenger or property the carrier decides is, or might be, inimical to safety." (49 U.S.C. § 44902(b).) However, this policy

---

continuing to serve alcoholic beverages to another passenger, who was harassing the plaintiff, reasoning that the allegations pertained to a service and hence the claims were preempted. The Ninth Circuit, in *Charas, supra,* 160 F.3d at page 1261, has since overruled *Harris* on this point.

The Second District Court of Appeal in *Vinnick v. Delta Airlines, Inc.* (2001) 93 Cal.App.4th 859 [113 Cal.Rptr.2d 471], again found a state law tort claim not preempted by the Act. There, a passenger who had been injured by luggage falling from an overhead bin asserted a state law tort against the airline. (*Id.* at p. 861.) The court concluded that under either the *Hodges* or the *Charas* definition of "services," the Act did not preempt the state law claims. (*Vinnick,* at pp. 868-869.)

[12]In *Wolens* the United States Supreme Court, in a passing reference, included "access to flights" in its understanding of the term "services." (*Wolens, supra,* 513 U.S. at p. 226 [115 S.Ct. at p. 823].) However, the *Wolens* court did not indicate that a state may not enforce its routine principles of personal injury and discrimination law in connection with an airline's refusal to allow a passenger to board. In the absence of clearer guidance from the United States Supreme Court, we will follow the Ninth Circuit Court of Appeals's holdings in *Charas* and *Newman,* as well as California authority as expressed in *Romano.*

is not a *state* policy, and hence does not fall within the language of *Wolens*. (See *Wolens*, at p. 233 [115 S.Ct. at p. 826].)[13]

Accordingly, we conclude the Act does not preempt any of the Aquinos' claims.

D., E.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

## III. DISPOSITION

We affirm the judgment of the superior court to the extent it granted summary judgment on the cause of action for intentional infliction of emotional distress. In all other respects, we reverse the judgment and remand for further proceedings consistent with this opinion.

Kay, P. J., and Reardon, J., concurred.

A petition for a rehearing was denied February 27, 2003, and the nonpublished portion of the opinion was modified.

---

[13]We note that the Fourth Circuit Court of Appeals, in *Smith v. Comair, Inc.* (4th Cir. 1998) 134 F.3d 254, 258-259, held a breach of contract claim preempted by the Act because the airline's refusal to allow the plaintiff to board a flight implicated airline safety policies under title 49 United States Code section 44902(b). However, the Act preempts *states* from imposing policies that affect an air carrier's prices, routes, or service. There is no indication in the Act that *federal* policies are likewise preempted.

*See footnote, *ante*, page 1272.